914 F.2d 248
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Ada M. MARSHALL, Plaintiff-Appellant,
v.
Louis W. SULLIVAN, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 89-2166.
 United States Court of Appeals, Fourth Circuit.
 Argued April 6, 1990.
Decided Sept. 21, 1990.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. W. Harris Grimsley, United States Magistrate. (CA-89-361-A).
 Christopher Temple Picot, Alexandria, Va., argued for Appellant.
 Victor Jerry Pane, Office of the General Counsel, Department of Health and Human Services, Philadelphia, Pa., argued for appellee; Beverly Dennis, III, Chief Counsel, Region III, Charlotte Hardnett, Chief, Social Security Litigation Division, Lawrence J. Harder, Assistant Regional Counsel, Office of the General Counsel, Department of Health and Human Services, Philadelphia, Pa.; Henry E. Hudson, United States Attorney, Robert C. Erickson, Assistant United States Attorney, Alexandria, Va., on brief.
 E.D.Va.
 REVERSED AND REMANDED.
 Before PHILLIPS and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 BUTZNER, Senior Circuit Judge:
 
 
 1
 Ada M. Marshall appeals from the magistrate's judgment affirming the Secretary's denial of her claim for disability insurance benefits under section 223 of the Social Security Act, 42 U.S.C. Sec. 423. For reasons discussed below, we reverse and remand the case for an award of benefits.
 
 
 2
 * Marshall is a 68 year old accountant who left work in 1983, after nearly 20 years with the Fairfax County, Virginia, school system. She was diagnosed as having chronic infectious mononucleosis in August of 1983 and, after several unsuccessful attempts at returning to work, resigned from her job in October 1983. Her initial claim for disability benefits in 1984 was denied. In 1986, she refiled her claim, which was again denied, as was her request for reconsideration. She was subsequently afforded a hearing before an administrative law judge who also rejected her claim. The Appeals Council declined to review the ALJ's decision, thus making it the final decision of the Secretary. Marshall filed suit against the Secretary in district court pursuant to 42 U.S.C. Sec. 405(g). The suit was heard by a magistrate, with provision for direct appeal to this court pursuant to 28 U.S.C. Sec. 636(c). The magistrate granted summary judgment to the Secretary and this appeal followed.
 
 
 3
 Marshall testified that she is able to take care of her necessities, such as bathing, dressing, and eating. She spends most of her time in the house and a good deal of that time in bed. She does very little cleaning or cooking and has had to give up her hobbies and most of her social life. Marshall also suffers frequently from headaches and sore muscles, for which she takes aspirin or Tylenol. Occasionally, she will feel better and engage in moderate activity, but such activity is followed by prolonged and heightened fatigue.
 
 
 4
 Dr. Daniels, who was Marshall's treating physician from 1983 through late 1986, diagnosed her disease as chronic infectious mononucleosis related to the Epstein-Barr virus (EBV).* In his report of July 11, 1986, Dr. Daniels stated that the diagnosis had been "confirmed and reconfirmed many times with lab studies that reveal a persistent and continual elevation of her Epstein-Barr Early Antigen/Antibody Titer." The laboratory reports in the record are consistent with Dr. Daniels' statement. In his letter of August 7, 1986, to Marshall's insurance company, Dr. Daniels concluded that Marshall "has certainly been totally disabled to return to her former job for the past many months, or any other job that requires any significant degree of physical activity for more than a few hours a day on a regular basis."
 
 
 5
 Marshall's treating physician at the time of the hearing was Dr. Shliefer, whom Marshall had been seeing for about one year. She diagnosed Marshall as having chronic EBV syndrome. Dr. Shliefer testified that Marshall was unable to engage in any type of employment and, in reference to sedentary jobs, doubted that Marshall could remain awake for a full eight hour shift. In her medical report of December 5, 1986, she concluded that "there is no way that she can hold any kind of gainful employment. She could not even live alone."
 
 
 6
 In addition to her treating physicians, Marshall was examined by Dr. Boland in 1984 on behalf of the Social Security Administration, by Dr. Dvorak in 1985 on behalf of a private insurance carrier, and by Dr. Meloni in 1986 on behalf of the state retirement board.
 
 
 7
 Dr. Boland's medical report refers to an examination to evaluate peripheral vascular disease. The report concludes that Marshall "has normal arterial circulation" and that "general neurological examination with respect to memory and strength was intact." The report does not address fatigue or EBV. Dr. Boland wrote that Marshall was able to walk up to two miles a day when she feels well and otherwise up to one mile a day. Marshall disputed this statement when she testified, but the ALJ credited Dr. Boland's report without questioning him. All other medical reports and testimony refer to walks of several blocks at most.
 
 Dr. Dvorak's report stated:
 
 8
 An important feature of [chronic mononucleosis] appears to be the degree of disability seemingly out of proportion to the objective extent of the illness. By all regards including formal evaluations, many of these patients reported appeared to be neurotic. However on detailed studies some small and yet subtle objective organic abnormalities are usually documented as is the case in this patient. Therefore my diagnosis is chronic infectious mononucleosis resulting in total functional disability. I do not think that the patient is at this point able to carry on her regular profession or do any other type of gainful employment.
 
 
 9
 Dr. Dvorak relied in part on laboratory tests which showed elevated levels of EBV antibodies. Dr. Meloni also diagnosed Marshall as having chronic EBV syndrome, based on her own examination and her review of the laboratory tests and examination done by Dr. Dvorak.
 
 
 10
 The only doctor's report which contradicted Marshall's claim of disability was filed by Dr. Blee, a medical advisor for the Social Security Administration who neither treated nor examined Marshall. Dr. Blee found that Marshall "retains the capacity for at least light work" because she was running up to two miles a day as of October of 1984, she performed well on a treadmill test in July of 1984, and a recent laboratory test revealed a normal reading for one of the two primary antibodies which indicate the presence of EBV.
 
 
 11
 The ALJ chose to rely primarily on Dr. Blee's opinions and the results of the treadmill test in finding Marshall not disabled. On appeal, Marshall claims the ALJ erred by relying on Dr. Blee's report rather than the medical reports of the treating and examining physicians. She also objects to the use of the treadmill test for measuring chronic fatigue.
 
 II
 
 12
 Our review of this case is prescribed by statute: "The court shall have the power to enter ... a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. Sec. 405(g). "A factual finding by the ALJ [as adopted by the Secretary] is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.1987). In this case, the ALJ misapplied this circuit's attending physician rule and used an improper standard in analyzing Marshall's fatigue.
 
 
 13
 The ALJ departed from the attending physicians rule by giving insufficient weight to Dr. Daniels' reports and Dr. Shliefer's testimony. As treating physicians, their opinions can be "ignored only if there is persuasive contradictory evidence." Foster v. Heckler, 780 F.2d 1125, 1130 (4th Cir.1986) (emphasis in original). The record in this case contains no such evidence.
 
 
 14
 Dr. Blee's report contains several errors. For example, Dr. Blee was under the mistaken impression that Marshall can run two miles a day. Any conclusion based on the assumption that Marshall can run two miles a day is suspect. Furthermore, Dr. Blee's reliance on the treadmill test is questionable since that test measures strength rather than stamina. The test is designed to show the competency of a patient's arterial system and heart, not the presence or effect of chronic EBV syndrome. Finally, an occasional normal reading for EBV antibodies is not necessarily inconsistent with a diagnosis of chronic EBV syndrome. See Straus, et al, Persisting Illness and Fatigue in Adults with Evidence of Epstein-Barr Virus Infection, 102(1) Annals Internal Med. 7, 11-12 (1985). In sum, we find that Dr. Blee's report does not provide a sufficient basis for rejecting the opinions of two treating physicians and two independent examining physicians.
 
 
 15
 Similarly, the treadmill test fails to provide persuasive evidence to contradict the treating and examining physicians. In his decision, the ALJ refers to that test as "an objective tool by which the Administrative Law Judge can measure the claimant's fatigue." This is clearly not the case; Marshall's performance on the treadmill revealed nothing about the increased fatigue she suffered following the test. As Dr. Shliefer testified, that test measures the capabilities of one's cardiovascular system and is of little value in assessing the debilitating effects of the fatigue associated with chronic EBV syndrome.
 
 
 16
 Nonetheless, the ALJ apparently felt Marshall's high level of performance on the treadmill proved that she had the "residual functional capacity" to work comfortably at lower levels of activity. He also seemed to rely on Dr. Shliefer's testimony regarding Marshall's practice of restricting the length of her walks so that she could, as the ALJ phrased it, "continue with her lifestyle." However, Marshall's lifestyle was quite limited. According to Marshall's testimony, she was only able to walk three times a week and each walk was followed by a nap of from 45 minutes to over two hours. Dr. Daniels repeatedly reported that Marshall's disability limited her to "being up and about around her house and immediate neighborhood." Dr. Shliefer testified that Marshall would be unable to remain awake for an eight hour shift. This evidence is inconsistent with the ALJ's conclusion that Marshall was capable of returning to her former accounting job or had the residual functional capacity to perform sedentary work.
 
 
 17
 The pertinent regulations define residual functional capacity as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2 Sec. 200.00(c) (1989) (emphasis added). Elsewhere, the regulations state: "When we assess your physical abilities (e.g., strength) we assess the severity of your impairment(s) and determine your residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. Sec. 404.1545(b) (1989) (emphasis added). The record indicates that Marshall could not sustain any level of activity for a significant period of time due to chronic fatigue.
 
 III
 
 18
 The ALJ improperly analyzed Marshall's fatigue, stating that "[w]hile it could be reasonable to conclude the presence of increased titers in the claimant substantiates the presence of fatigue it says nothing to quantify the degree of fatigue experienced by the claimant." Requiring objective evidence of the degree of fatigue is inconsistent with the standards applied to other subjective factors, primarily pain, which are outlined in our earlier cases and in Social Security Act, regulations, and rulings.
 
 
 19
 For example, in Foster we held that "pain itself can be disabling," 780 F.2d at 1128, and that "[t]he Disability Reform Act requires medical evidence of a condition that could reasonably produce pain, not objective evidence of the pain itself or its degree." 780 F.2d at 1129. See also Hyatt v. Sullivan, 899 F.2d 329, 334 (4th Cir.1980); Myers v. Califano, 611 F.2d 980, 983 (4th Cir.1980); Thorne v. Weinberger, 530 F.2d 580, 583 (4th Cir.1976). The Disability Reform Act refers to pain and other symptoms, as follows:
 
 
 20
 An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability.
 
 
 21
 42 U.S.C. Sec. 423(d)(5)(A) (West Supp.1990).
 
 
 22
 Social Security regulations require the presence of "medical signs or findings [that] show that there is a medical condition that could be reasonably expected to produce those symptoms." 20 C.F.R. Sec. 404.1529 (1989). Social Security Ruling 88-13 notes that "[i]n developing evidence of pain or other symptoms, it is essential to investigate all avenues presented that relate to subjective complaints, including the claimant's prior work record and information and observations by treating and examining physicians and third parties...." 32 Unempl.Ins.Rep. (CCH) p 14,118 A (Sept. 7, 1988). It is reasonable to consider that fatigue is one of the "other symptoms" referred to in the Act, regulation, and ruling. It should be analyzed accordingly.
 
 
 23
 Here, the record shows that Marshall had a good work history: she worked twenty years with the Fairfax County school system. During the hearing, the ALJ acknowledged that "she's not a malingerer ... and she does have a significant impairment." As discussed in greater detail above, her treating and examining physicians found her totally disabled. They used medically acceptable laboratory tests in finding that Marshall suffers from a condition, known as CFIDS or chronic EBV syndrome, which reasonably can be expected to produce her disabling fatigue. Neither the statute nor the regulations require Marshall to prove the exact cause of her condition. See Sparks v. Bowen, 807 F.2d 616, 617-18 (7th Cir.1986). They require only that she have a medically ascertainable condition that reasonably could be expected to cause her symptoms. Foster, 780 F.2d at 1129. Marshall has satisfied that requirement.
 
 IV
 
 24
 We find that Dr. Blee's report and the results of the treadmill test do not provide substantial evidence to support the Secretary's denial of benefits. Further, we find no persuasive evidence contradicting the opinions of the treating and examining physicians who concluded that Marshall was totally disabled.
 
 
 25
 We reverse and remand to the district court with instructions to remand to the Secretary for award of benefits.
 
 REVERSED AND REMANDED
 
 
 *
 Infectious mononucleosis is caused by the Epstein-Barr virus. Stedman's Medical Dictionary 979 (25th ed. 1990). Marshall's "chronic fatigue" disease appears to go by several names and its exact cause is unknown. The physicians in this case refer to it as either chronic infectious mononucleosis or chronic Epstein-Barr virus syndrome. Their diagnoses were based in part on the presence of antibodies activated by elevated levels of EBV. More recently, the medical community is finding that EBV activation is more likely a result rather than a cause of the disease and that the disease is distinct from mononucleosis. Apparently, the disease is currently known as "chronic fatigue and immune dysfunction syndrome," or CFIDS. Nonetheless, by whatever name, the disease evidently exists and often has severely debilitating effects. See The CFIDS Assoc., Chronic Fatigue and Immune Dysfunction Syndrome Patient Guide (Nov. 30, 1988); Straus, et al, Persisting Illness and Fatigue in Adults with Evidence of Epstein-Barr Virus Infection, 102(1) Annals Internal Med. 7-16 (1985)